## JAMES v. SCOTT.

9   579
116   271

1. The first article of the treaty of 1814, with the Creek Indians, or the act of Congress of 1817, which provides for the location of lands reserved under that article, and for other purposes, does not invest the chiefs, warriors, or other reservees, with an estate which he can alienate at pleasure.
2. *Quere?* Does evidence, that a reservee under the treaty of 1814, with the Creek Indians, or under the act of Congress of 1817, has removed to another county in the State than that in which his reservation is situated, establish the fact of his voluntary abandonment; or may it not be intended, in the absence of proof, that he still retains the control over it, and that others cultivate it for him.
3. A reservation of the public lands, which is subject to forfeiture upon the alienation of the reservee, and its voluntary abandonment, is nevertheless a sufficient consideration for the contract by which the reservee agrees to sell it, and receive slaves as an equivalent—the contract being *bona fide* on both sides. And the vendor of the slaves cannot maintain an action to recover them back.
4. The contingent interest of a party in slaves, if in danger of being lost, &c., by their removal, &c., it seems may be protected in equity.

Writ of Error to the Circuit Court of Macon.

THIS was an action of detinue, at the suit of the plaintiff in error, against the defendant, to recover three slaves, to wit: Arena, a woman; Maria, a girl; and Cyrus, a boy. The cause was tried on the plea of *non detinet*, a verdict was returned for the defendant, and judgment was rendered accordingly. From a bill of exceptions, sealed at the instance of the plaintiff, it appears that an agreement was made and entered into between the plaintiff and George Stiggins, which recites, that the latter was entitled by patent from the general government, under the treaty of Fort Jackson, to a tract of land situate in Clark county, and known as fractional section one, in township four and range three, east, lying on the west side of the Alabama river, containing 170 60-100 acres. It is further recited that Stiggins being prevented by the trea-

ty referred to, from conveying a fee simple title to the plaintiff, doth lease to the plaintiff the lands above described during the life of the lessor, without the molestation of him, his heirs, executors, &c., or any one claiming under him, or them. In consideration of such lease, the plaintiff agrees that he will place in the possession of Stiggins, the following slaves: Arena, Maria, Cyrus, and others, who are specially named— all of whom are the property of the plaintiff. It is also stipulated, that the services of these slaves shall go to the use and benefit of the lessor, as an equivalent for the lease, from year to year, during his life. The parties to the instrument further agree, that whenever the children of Stiggins shall, on attaining the age of twenty-one years, convey in fee simple, their interest in the land, respectively, to the plaintiff, his heirs and assigns, then the plaintiff, his heirs, &c., will relinquish a proportionable share of interest in the slaves particularized in the agreement, and their future increase to each of the heirs who shall relinquish his right as above provided. This agreement was signed and sealed by the parties, in the presence of witnesses, and recorded in the office of the Clerks of the County Courts of Macon and Clark counties.

It was further proved by the plaintiff, that Stiggins was a Creek Indian, and had a wife and children. Two witnesses testified that Stiggins and his family removed from Monroe county, and settled in Macon, some time before the agreement above recited was executed, and have resided in the latter county ever since. The same witnesses stated, that when Stiggins removed to Macon county, he brought with him negroes bearing the same names as those sued for, in the present action, has never since had any other negroes of the same names. *Further*, they proved the value of each of the slaves in question, and of their hire respectively, and that the defendant admitted they were in his possession when the suit was commenced.

The defendant proved, that on the 3d July, 1843, he purchased the slaves in question at sheriff's sale, in Macon county, under a *fieri facias* in favor of McBride against Stiggins and others, issued on a judgment obtained in 1840; that they had been in Stiggins' possession from the time the agreement

James v. Scott.

was entered into, up to the sale, and that the defendant had paid the sum at which they were bid off.

It was further proved that the plaintiff's attorney, immediately preceding the sale, but on the same day, gave notice publicly, that the slaves were the plaintiff's property, and forbid their sale. The defendant was present, and heard the notice, and purchased the slaves which had been levied on as the property of Stiggins, although the plaintiff was no party to the execution.

Among other things, the court charged the jury as follows, viz:    1. If the jury believe that Stiggins had abandoned the occupancy of the land before the agreement was signed by the parties to it, with the intention not to return to it, without the knowledge or connivance of the plaintiff, and deceived the plaintiff by representing that he had a right to the same, such a representation was a fraud, and the consideration necessary to support the agreement would have failed. But if Stiggins abandoned the possession at the instance of the plaintiff, or with his knowledge, and with an understanding between them, that the plaintiff was to have the possession, and the terms were afterwards to be reduced to writing, then there was a sufficient consideration to support the agreement.

2. If Stiggins received. the negroes in question, in consideration of the use of the lands, and the plaintiff has continued to occupy the same ever since, the agreement is founded upon an adequate consideration.

3. If Stiggins had ceased to occupy the land before the writing was executed, and the same was executed, and the negroes delivered by the plaintiff, in order to obtain the possession of the land, so that he might occupy it until dispossessed by the government, then the agreement was binding on the plaintiff· The mere possessory right to public land is the subject of sale and transfer, and will constitute the consideration of the contract.

Thereupon the plaintiff's counsel prayed the court to instruct the jury as follows, viz:    1. If the slaves sued for, were the plaintiff's property prior to the execution of the written agreement, and are the same that are designated therein, if the agreement was entered into *bona fide,* at the

time it bears date, if Stiggins had no other title to the slaves
than he acquired thereby, and the defendant had no other
right than he acquired by his purchase at sheriff's sale, if
Stiggins and his descendants had voluntarily abandoned the
land before the agreement was entered into, and the slaves
in controversy were in the defendant's possession when the
writ issued in this case, and are of the respective values
to which the witness testified, then the plaintiff is entitled to
recover.

2· If the slaves in controversy belonged to the plaintiff, at
and before the execution of the agreement, and had been
sold by the sheriff as shown by the evidence, such sale de-
termined all interest that Stiggins had in the slaves, in virtue
of his agreement with the plaintiff, and authorized the latter
to recover of the defendant, if the jury believed all the testi-
mony in the cause.    This prayer for instructions was denied
by the court, and the plaintiff excepted to the charges given
and refused.

S. F. RICE, for the plaintiff in error, made the following
points :    1. Stiggins was a Creek Indian, and claimed the
land which he professed to lease to the plaintiff, as a reserva-
tion under the treaty of Fort Jackson.    It is insisted the
lease was void, because it was opposed to the treaty—in fact
prohibited by it, and it was competent for the plaintiff to re-
cover back what he paid for it.    [4 Porter's Rep. 141 ; 3
Id. 362 ; 1 vol. State Papers, Indian Affairs, 826 ; 1 Land
Laws, 289 ; 2 Id. Ops. Attorney General, 64, 78 ; see also,
last clause, 1 Art. of Treaty.]    A party who has paid money
on a void contract, may recover it in assumpsit—not having
had any validity, it is not necessary to go through the forms
necessary to a rescission of an agreement which the law re-
cognizes.    [2 Stew. Rep. 21 ; 7 Ala. Rep. 129.]

2. The proof shows that Stiggins had abandoned the pos-
session of the land before he leased it ; this being the case,
the right eo instanti vested in the United States, and the
plaintiff had the right at any time, to consider the contract
as merely void.

No counsel appeared for the defendant.

COLLIER, C. J.—By the 1st section of the treaty negotiated with the Creek Nation of Indians, at Fort Jackson, in 1814, provision is made in favor of friendly chiefs and warriors, stipulating that each one embraced by it, "shall be entitled to a reservation of land within the said territory, of one mile square, to include his improvements as near the centre thereof as may be, which shall inure to the said chief or warrior, and his descendants, so long as he or they shall continue to occupy the same, who shall be protected by, and subject to, the laws of the United States; but upon the voluntary abandonment thereof by such possessor, or his descendants, the right of occupancy or possession of said lands shall devolve to the United States, and be identified with the right of property ceded hereby." A law was enacted by Congress, in 1817, making provision for the location of the lands reserved by the first article of the treaty, and for other purposes. The second section of that act, after prescribing the manner of the location, has the following *proviso*, viz:—
"That the lands so selected shall inure to such chief or warrior, so long only as he shall continue to occupy and cultivate the same; and in case he shall not have abandoned, the possession shall on his decease, descend to, and vest in his heirs, in fee simple, reserving to the widow of such chief, or warrior, the use and occupation of one third part of said lands during her natural life."

The second section provides, that where a chief or warrior entitled to a reservation, shall have died since the treaty was signed, leaving a widow and a child or children, who have continued to occupy and cultivate the land, they shall have the right of selection as the original claimant had; and the title of the child or children to the lands thus selected, shall be in fee simple, reserving to the widow, if any, the use of one-third thereof, during her life: "*Provided however*, that the said child or children shall not have the power to alienate the said lands, except by devise, until each and every one of them shall have arrived at the age of twenty-five years."

By the third section of the act, it is enacted, "that the descendant of any native Creek Indian, male or female, who at the commencement of the late war with the hostile Creeks occupied and cultivated a farm or plantation, who continued

friendly to the United States during that war, and who after the termination of hostilities, returned to, and has continued to occupy and cultivate the said farm or plantation, shall be entitled to a reservation of two quarter sections of land, to be selected in the manner stated in the first section of this act; which lands shall enure to them so long as they shall continue to occupy and cultivate the same; and on their death shall descend in fee to the children; and on failure of children, shall revert to the United States; reserving, however, to the husband or widow, as the case may be, the right to occupy and cultivate one-third part of the lands during their natural lives."

The fourth section provides, that the child or children of any chief or warrior who resided in the limits of the ceded territory at the commencement of the then late Creek war, and who was killed or died during the same in the service of the United States, or who has since died of wounds then received, shall be entitled, without payment, to a reservation of so much land as such chief or warrior would have been entitled to, had he been living at the time the treaty was signed; which land shall be located in the manner prescribed by the first section of the act.

This statute not only provides for giving effect to the first article, but gives reservations to several classes who do not come within the terms of the treaty. Perhaps as the contract recites that Stiggins' claim is founded upon the treaty, he must, in the condition of the record, be considered as one of the chiefs or warriors for whom it provides. Be this as it may, he must be taken to come within a category which inhibits him from making a conveyance of his reservation. Each reservee thus situated, whether under the treaty or the act of Congress, have nothing more than a life estate, depending upon his continued occupancy, &c.

Do the facts stated in the bill of exceptions show an abandonment of the possession by Stiggins? Is not his removal to Macon county, previous to entering into the agreement with the plaintiff, entirely consistent with the idea of his continued occupancy? There certainly could have been no abandonment, if he retained the control over it, and continued to cultivate it as a plantation with his own laborers. We

all know that it is quite common for one man to be the proprietor of several farms, or to live at one place, and cultivate a plantation, sometimes hundreds of miles from his residence. Who can undertake to say, from the facts before us, that such was not the situation of Stiggins when he made the contract with the defendant?

But assuming the facts to be otherwise, and will the plaintiff be placed in a more favorable condition? His contract shows that he was aware of the nature of Stiggins' tenure, was willing to part with the possession of the slaves to him, upon the latter undertaking to make a lease for his life of the premises—stipulating that a complete title should be made to the slaves to Stiggins's children, should they, upon attaining their majority, make a fee simple to the land. It must be intended that Stiggins yielded up the possession to the plaintiff, in consideration that the slaves mentioned in the contract, were delivered to him, and thus abandoned, and as a legal consequence, forfeited to the United States his right to the reservation. Here was certainly a loss to Stiggins, and a benefit to the plaintiff. Although the latter may have received nothing more than the possession, determinable at the will of the Federal Government; yet this gave him the right to occupy and cultivate it against all the rest of the world. These rights we all know have been matured and made perfect by the bounty of Congress. There is nothing to show that the plaintiff has been molested in the enjoyment of the premises, or to warrant the conclusion that he will not, in virtue of his possession, obtain a fee simple title as a mere gratuity, or upon the payment of a sum which bears no proportion to its real value.

The possession of land, without a title, is regarded as a thing of value, and it seems, that if it was allowable for the defendant to rescind the contract, he should have placed Stiggins in *statuo quo*, or at least offered to do so before he commenced his action. The view we have already taken, shows that the agreement, on either side, is sustained by a valuable consideration. Whether, what Stiggins parted with, was equivalent to what the plaintiff gave him in return, is wholly immaterial, even if we had the proper *data* before us to enable us to determine. It is then clear from the facts, that the

74

plaintiff is not entitled to recover. If he has not parted with the title, and the slaves are in danger of being removed, and perhaps upon other grounds, a Court of Chancery could afford him ample protection.

We have but to add, that the judgment of the Circuit Court is affirmed.